# Exhibit  6 - Operating Agreement

## OPERATING AGREEMENT FOR THE
## KELHAM VINEYARDS & WINERY, LLC

*change 2*

A. THIS OPERATING AGREEMENT is entered into as _____2010, by SUSANNA R. KELHAM, RONALD C. NICHOLSEN and HAMILTON NICHOLSEN (referred to individually as a Member and collectively as the Members).

B. The Members desire to amend a limited liability company (Company) formed under the Beverly-Killea Limited Liability Company Act.

C. The Members enter into this Agreement to form and provide for the governance of the Company and the conduct of its business, and to specify their relative rights and obligations.

NOW THEREFORE, the Members agree as follows:

### ARTICLE I: DEFINITIONS

Capitalized terms used in this Agreement have the meanings specified in this Article or elsewhere in this Agreement and when not so defined shall have the meanings set forth in California Corporations Code section 1700

1.1. "Act" means the Beverly-Killea Limited Liability Company Act California Corporations Code 17000-17705), including amendments from time to time.

1.2. "Adjusted Capital Contribution" is defined in Article IV, Section 4.6(a).

1.3. "Adjusted Capital Account Deficit" is defined in Article IV, Section 4.3(a).

1.4. "Affiliate" of a Member means (1) any Person directly or indirectly, through one or more intermediaries, controlling, controlled by, or under common control with the Member. The term "control" (including the terms "controlled by" and "under common control with") means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a Person, whether through membership, ownership of voting securities, by contract, or otherwise.

1.5. "Agreement" means this operating agreement, as originally executed and as amended from time to time.

1.6. "Articles of Organization" is defined in Corporations Code section 17001(b), as applied to this Company.

1.7. "Assignee" means a person who has acquired a Member's Economic Interest in the Company, by way of a Transfer in accordance with the terms of this Agreement, but who has not become a Member.

1.8. "Assigning Member" means a Member who by means of a Transfer has transferred an Economic Interest in the Company to an Assignee.

1.9. "Available Cash" means all net revenues from the Company's operations, including net proceeds from all sales, refinancing, and other dispositions of Company property that the Manager, in the Manager's sole discretion, deems in excess of the amount reasonably necessary for the operating requirements of the Company, including debt reduction and Reserves.

1.10. "Book Depreciation" is defined in Article IV, Section 4.3(b).

1.11. "Capital Account" means, with respect to any Member, the account reflecting the capital interest of the Member in the Company, consisting of the Member's initial Capital Contribution maintained and adjusted in accordance with Article III, Section 3.[6].

1.12. "Capital Contribution" means with respect to any Member, the amount of the money and the Fair Market Value of any property (other than money) contributed to the Company (net of liabilities secured by such contributed property that the Company is considered to assume or take "subject to" under IRC section 752) in consideration of a Percentage Interest held by such Member. A Capital Contributions shall not be deemed a loan.

1.13. "Capital Event" means a sale or disposition of any of the Company's capital assets the receipt of insurance and other proceeds derived from the involuntary conversion of Company property, the receipt of proceeds from a refinancing of Company property, or a similar event with respect to company property or assets.

1.14. "Code or "IRS" means the Internal Revenue Code of 1986, as amended, and any successor provision.

1.15. "Company" means the company named in Article II, Section2.2 of this Agreement.

1.16. "Company Minimum Gain" is defined in Article IV, Section 4.3(c).

1.17. "Confidential Information" is defined in Article X, Section 10.2.

1.18. "Corporations Code" ("Corp C") means the California Corporations Code.

1.19. "Economic Interest" means a Person's right to share in the income, gains, losses, Deductions, credit or similar items of, and to receive distributions from, the Company, but does not include any other rights of a Member, including the right to vote or to participate in management.

1.20. "Encumber" means the act of creating or purporting to create an Encumbrance, whether or not perfected under applicable law.

1.21. "Encumbrance" means, with respect to any Membership Interest, or any element thereof, a mortgage, pledge, security interest, lien, proxy coupled with an interest (other than as contemplated in this Agreement), option, or preferential right to purchase.

1.22. "Gross Asset Value" means, with respect to any item of property of the Company the item's adjusted basis for federal income tax purposes, except as follows:

(a) The initial Gross Asset Value of any item of property contributed by a Member to the Company shall be the fair market value of such property, as mutually agreed by the contributing Member and the Company;

(b) The Gross Asset Value of any item of Company property distributed to any Member shall be the fair market value of such item of property on the date of distribution; and

(c) The Gross Asset Value of any item of Company property shall be subject to the Adjustments specified in Article IV, Section 4.11.

1.23. "Initial Members" means those Persons whose names are set forth in the first sentence of this Agreement. A reference to an "Initial Member" means any of the Initial Members.

1.24. "Involuntary Transfer" means with respect to any Membership Interest, or any element thereof, any Transfer or Encumbrance, whether by operation of law, pursuant to court order, foreclosure of a security interest, execution of a judgment or other legal process, or otherwise, including a purported transfer to or from a trustee in bankruptcy, receiver, or assignee for the benefit of creditors.

1.25. "Issue" or "Child" or "Children" shall refer to lineal issue of all degrees of the designated ancestor. Said term shall exclude stepchildren, foster children and children naturally born but not raised for a substantial time by the designated ancestor but shall include children adopted into the class.

1.26. "Losses". See Article IV, Section 4.2.

1.27. "Majority of Members" means a Member or Members whose Percentage Interests represent more than 50 percent of the Percentage Interests of all the Members.

1.28. "Manager" or "Managers" means the Person(s) named as such in Article II or the Persons who from time to time succeed any Person as a Manager and who, in either case, are serving at the relevant time as a Manager. The term "Manager" and the reference to the Manager in the singular shall be deemed to refer to the Manager or Managers serving under this document from time to time.

1.29. "Member" means an initial Member or a Person who otherwise acquires a Membership Interest, as permitted under this Agreement, and who remains a Member.

1.30." Member Nonrecourse Debt" is defined in Article IV, Section 4.3(d).

1.31. "Member Nonrecourse Debt Minimum Gain" is defined in Article IV, Section 4.3(e).

1.32." Member Nonrecourse Deductions" is defined in Article IV, Section 4.3(f).

1.33. "Membership Interest" means a Member's rights in the Company, collectively, Including the Member's Economic Interest, any right to Vote or participate in management, and any right to information concerning the business and affairs of the Company.

1.34." Nonrecourse Deductions" is defined in Article IV, Section 4.3(g).

1.35." Nonrecourse Liability" is defined in Article IV, Section 4.3(h).

1.36. "Notice" means a written notice required or permitted under this Agreement. A notice shall be deemed given or sent when deposited as certified mail or for overnight delivery, postage and fees prepaid, in the United States mails; when delivered to Federal Express, United Parcel Service, DHL, WorldWide Express, or Airborne Express, for overnight delivery, charges prepaid or charged to the sender's account; when personally delivered to the recipient; when transmitted by electronic means, and such transmission is electronically confirmed as having been successfully transmitted; or when delivered to the home or office of a recipient in the care of a person whom the sender has reason to believe will ultimately communicate the notice to the recipient.

1.37. "Percent of the Members" means the specified total of Percentage Interests of all the members.

1.38. "Percentage Interest" means a fraction, expressed as a percentage, the numerator of which is the total of a Member's Capital Account and the denominator of which is the total of all Capital Accounts of all Members.

1.39. "Person" means an individual, partnership, limited partnership, trust, estate, association, corporation, limited liability company, or other entity, whether domestic or foreign.

1.40. "Profits" and "Losses" are defined in Article IV, Section 4.2.

1.41. "Proxy" has the meaning set forth in the first paragraph of Corp C 17001(ai) A Proxy may not be transmitted orally.

1.42. "Regulations" ("Reg") means the income tax regulations promulgated by the United States Department of the Treasury and published in the Federal Register for the purpose of interpreting and applying the provisions of the Code, as such Regulations maybe

amended from time to time, including corresponding provisions of applicable successor regulations.

1.43. "Reserves" means the aggregate of reserve accounts that the Manager, in the Manager's sole discretion, deems reasonably necessary to meet accrued or contingent liabilities of the Company, reasonably anticipated operating expenses and working capital requirements.

1.44. "Successor in Interest" means an Assignee, a successor of a Person by merger or otherwise by operation of law, or a transferee of all or substantially all of the business or assets of a Person.

1.45. "Tax Item" means each item of income, gain, loss, deduction, or credit of the Company.

1.46. "Tax Matters Partner" means such Person as may be designated under Article VI, Section 6.6.

1.47. "Transfer" means, with respect to a Membership Interest or any element of a Membership Interest, any sale, assignment, gift, Involuntary Transfer, Encumbrance, or other disposition of such a Membership Interest or any element of such Membership Interest, directly or indirectly, other than an Encumbrance that is expressly permitted under this Agreement.

1.48. Triggering Event" is defined in Article VIII, Section8.4.

1.49. "Vote" means a written consent or approval, a ballot cast at a meeting, or, a voice vote.

1.50. "Voting Interest" means with respect to a Member, the right to Vote or participate in management and any right to information concerning the business and affairs of the Company provided under the Act, except as limited by the provisions of this Agreement. A Member's Voting Interest shall be directly proportional to that Member's Percentage Interest.

## ARTICLE II: ARTICLES OF ORGANIZATION

2.1. Promptly following execution of this Agreement, the Manager shall cause Restated Articles of Organization, in the form attached to this Agreement as Exhibit 1, to be filed with the California Secretary of State.

2.2. The name of the Company shall be the KELHAM VINEYARDS & WINERY, LLC

2.3. The principal executive office of the Company shall be at 360 Zinfandel Lane, St. Helena, California, or such other place or places as may be determined by the Manager from time to time.

2.4. The initial agent for service of process on the Company shall be SUSANNA R. KELHAM, whose address is: 360 Zinfandel Lane, St. Helena, California 94574. The Manager may from time to time change the company's agent for service of process.

2.5. The Company will be formed for the purposes of engaging in any lawful act or activity for which a limited liability company may be organized under the Beverly-Killea Limited Liability Company Act.

2.6. The Members intend the Company to be a limited liability company under the Act, classified as a partnership for federal and, to the maximum extent possible, state income taxes. Neither the Manager nor any Member shall take any action in consistent with the express intent of the parties to this Agreement

2.7. The term of existence of the Company shall comment on the effective date of filing of Articles of Organization with the California Secretary of State, and shall continue until the date specified in the article of organization, unless sooner terminated by the provisions of this Agreement or as provided by law.

2.8. The names and addresses of the Initial Members are as set forth in Exhibit 2.

2.9. The name and business address of the Manager is as set forth in Exhibit 3.

### ARTICLE III: CAPITAL AND CAPITAL CONTRIBUTIONS

3.1. Each Member shall contribute to the capital of the Company as the Member's initial Capital Contribution the money and property specified in Exhibit 4. The initial Fair Market Value of each item of contributed property (net of liabilities secured by such property) that the Company is considered to assume or to take "subject to" under IRC section 752, is also set forth in Exhibit 4, together with the description and amount of these liabilities. If a Member fails to make the initial Capital Contributions specified in this Section within 30 days after the effective date of this Agreement, that Member's entire Membership Interest shall terminate, and that Member shall indemnify and hold the Company and the other Members harmless from any loss, cost, or expense, including reasonable attorney fees caused by the failure to make the initial Capital Contribution.

3.2. No Member shall be required to make any additional Capital Contributions. No Member may voluntarily make any additional Capital Contribution.

3.3. An individual Capital Account for each Member shall be maintained in accordance with the requirements of Reg. 1.704-1(b)(2)(iv) and adjusted in accordance with the following provisions:

(a) A Member's Capital Account shall be increased by that Member's Capital Contributions, that Member's share of Profits, and any items in the nature of income or gain that are specially allocated to that Member pursuant to Article IV.

(b) A Member's Capital Account shall be increased by the amount of any Company liabilities assumed by that Member subject to and in accordance with the provisions of Reg 1.704-1(b)(2)(iv)(c).

(c) A Member's Capital Account shall be decreased by (a) the amount of cash distributed to that Member; (b) the Fair Market Value of any property of the Company so distributed, net of liabilities secured by such distributed property that the distributee Member is considered to assume or to be subject to under IRC section 752; and (c) the amount of any items in the nature of expenses or losses that are specially allocated to that Member pursuant to Article IV.

(d) A Member's Capital Account shall be reduced by the Member's share of any expenditure of the Company described in IRC section 705(a)(2)(B) or which are treated as IRC section 705(a)(2)(B) expenditures pursuant to Reg section 1.704- 1(b)(2)(iv)(i) (including syndication expenses and losses nondeductible under IRC sections 267(a)(l) or 707(b)).

(e) If any Economic Interest (or portion thereof) is transferred, the transferee of such Economic Interest or portions shall succeed to the transferor's Capital Account attributable to such interest or portion.

(f) The principal amount of a promissory note that is not readily traded on an established securities market and that is contributed to the Company by the maker of the note shall not be included in the Capital Account of any Person until the Company makes a taxable disposition of the note or until (and to the extent) principal payments are made on the note, all in accordance with Reg section1.70 4-1(b)(2)(iv)(d)(2).

(g) Each Member's Capital Account shall be increased or decreased as necessary to reflect a revaluation of the Company's property assets in accordance with the requirements of Reg sections 1.704-1(b)(2)(iv)(f) and 1.704-1(b)(2)(iv)(g), including the special rules under Reg section 1.701-l(b)(4), as applicable. The provisions of this Agreement respecting the maintenance of Capital Accounts are intended to comply with Reg section1.704-1(b) and shall be interpreted and applied in a manner consistent with those Regulations.

3.4. A Member shall not be entitled to withdraw any part of the Member's Capital Contribution or to receive any distributions, whether of money or property, from the Company except as provided in this Agreement.

3.5. No interest shall be paid on funds or property contributed to the capital of the Company or on the balance of a Member's Capital Account.

3.6. A Member shall not be bound by, or be personally liable for, the expenses, liabilities, or obligations of the Company except as otherwise provided in the Act or in this Agreement.

3.7. No Member shall have priority over any other Member with respect to the return of a Capital Contribution or distributions or allocations of income, gain, losses, deductions, credits or items thereof.

## ARTICLE IV: ALLOCATIONS AND DISTRIBUTIONS

4.1. The Profits and Losses of the Company and all items of the Company income, gain, loss, deduction, or credit shall be allocates, for Company book purposes and for tax purposes, to a Member in accordance with the Member's Percentage Interest.

4.2. As used in this Agreement, "Profits and Losses" means, for each fiscal year or other period specified in this Agreement, an among equal to the Company's taxable income or loss for such period, determined in accordance with the IRC section 703(a), including al Tax Items required to be stated separately pursuant to IRC section 703(a)(1), with the following adjustments:

(a) Any income of the Company that is exempt from federal income tax and not otherwise taken into account in computing Profits or Losses shall be added to such taxable income or loss;

(b) Any expenditures of the Company described in IRC section705(a)(2)(B) or treated as IRC section 705(a)(2)(B) expenditures pursuant to Reg section 1.704-1(b)(z)(iv)(i) and not otherwise taken into account in computing Profits or Losses shall be subtracted fom such taxable income or shall increase such loss; and

(c) Notwithstanding the foregoing provisions of this Section 4.2, any items of income, gain, loss, or deduction that are specially allocated shall not be taken into account in computing Profits or Losses under Section 4.1.

4.3. The following definitions shall apply with respect to this Article IV.

(a) "Adjusted Capital Account Deficit" means with respect to any Member the deficit balance, if any, in such Member's Capital Account as of the end of the relevant fiscal year of the Company, after such Member's Capital Account has been adjusted as follows: (1) the Member's Capital Account shall be increased by the amount of such Member's share of Company Minimum Gain and Member N onrecourse Debt Minimum Gain; and(2) the Member's Capital Account shall be decreased by the amount of the items described in Reg sections 1.704-l(b)(2)(ii)(d)(4),(5), and (6).

This definition of Adjusted Capital Account Deficit is intended to comply with the provisions of Reg section 1.704-1(b)(2)(ii)(d) and shall be interpreted consistently with that Regulation.

(b) "Book Depreciation" means, with respect to any item of Company property for a given fiscal year, a percentage of depreciation or other cost recovery deduction allowable for federal income tax purposes for such item during that fiscal year equal to the result (expressed as a percentage) obtained by dividing (1) the Fair Market Value of that item at the beginning of the fiscal year (or the acquisition date during

the fiscal year), by (2) the federal adjusted tax basis of the item at the beginning of the fiscal year (or the acquisition date during the fiscal year). If the adjusted tax basis of an item is zero, the Manager may determine Book Depreciation, provided that he does so in a reasonable and consistent manner.

(c) "Company Minimum Gain" has the meaning set forth in Reg section 1.704-2(d)(1).

(d) "Member Nonrecourse Debt" is defined in Reg section 1.704-2(b)(4).

(e) "Member Nonrecourse Debt Minimum Gain" for a fiscal year of the Company means the net increase in Minimum Gain attributable to Member Nonrecourse Debt, determined as set forth in Reg section 1.704-2(i)(2).

(f) "Member Nonrecourse Deductions" has the meaning set forth in Reg section 1.704-2(1)(2). For any fiscal year of the Company the amount of Member Nonrecourse Deductions with respect to a Member Nonrecourse Debt equals the net increase during that fiscal year in Member Nonrecourse Debt Minimum Gain attributable to such Member Nonrecourse Debt during that fiscal year, reduced (but not below zero) by the amount of any distributions during such year to the Member bearing the economic risk of loss for such Member Nonrecourse Debt if such distributions are both from the proceeds of such Member Nonrecourse Debt and are allocable to an increase in Member Nonrecourse Debt Minimum Gain attributable to such Member Nonrecourse Debt, all as determined according to the provisions of Reg section 1.704-2(i)(2). In determining Member Nonrecourse Deductions the ordering rules of Reg section 1.704-2(j) shall be followed.

(g) "Nonrecourse Deductions" has the meaning set forth in Reg section 1.704-2(c). The amount of Nonrecourse Deductions for a Company fiscal year equals the net increase in the amount of Company Minimum Gain during that fiscal year, reduced (but not below zero) by the aggregate amount of any distributions during that fiscal year of proceeds of a Nonrecourse Liability that are allocable to an increase in Company Minimum Gain.

(h) "Nonrecourse Liability" is defined in Reg section 1.752-1(a)(2).

4.4. The following special allocations shall be made in the following order:

(a) Company Minimum Gain Chargeback. If there is a net decrease in Company Minimum Gain during a fiscal year, each Member shall be allocated before any other allocation under this Section, items of Company income and gain for such fiscal year equal to such Member's share of the net decrease in Company Minimum Gain as determined in accordance with Reg section1.704-2(g) (2).

(b) Member Nonrecourse Debt Minimum Gain Chargeback. If there is a net decrease in Member Nonrecourse Debt Minimum Gain during a fiscal year, any Member with a share of the Member Nonrecourse Debt Minimum Gain attributable to such Member

Nonrecourse Debt as of the beginning of such fiscal year shall be allocated items of Company income and gain for such year (and, if necessary, subsequent years) equal to that Member's share of the net decrease in Member Nonrecourse Debt Minimum Gain. A Member's share of net decrease in Member Nonrecourse Debt Minimum Gain shall be determined pursuant to Reg section 1.704-2 (g)(2). A Member shall not be subject to the foregoing chargeback to the extent permitted under Reg section 1.704-2(i)(4).

(c) Qualified Income Offset. If any Member unexpectedly receives an adjustment, allocation, or distribution described in Reg section 1.704-1(b)(2)(ii)(d)(4)(5), or (6), such Member shall be allocated items of Company income and gain (consisting of a pro rata portion of each item of Company income including gross income and gain for such fiscal year) in an amount and manner sufficient to eliminate the Adjusted Capital Account Deficit created by such adjustment, allocation, or distribution.

4.5. Member Nonrecourse Deductions for any fiscal year of the Company shall be allocated to the Members in the same proportion as Profits are allocated under Section 4.1, provided that any Member Nonrecourse Deductions for any fiscal year or other period shall be allocated to the Member who bears (or is deemed to bear) the economic risk of loss with respect to the Member Nonrecourse Debt to which such Member Nonrecourse Deductions are attributable in accordance with Reg section 1.704-2(i)(2).

4.6. In any fiscal year of the Company, Profits in excess of Losses of the Company resulting from a Capital Event in that Fiscal Year shall be allocated to the Members in the following order:

(a) To Members, whose Adjusted Capital Contributions are in excess of their Capital Accounts, in proportion to those excesses, until all of those excesses have been eliminated. "Adjusted Capital Contributions" means, with respect to each Member the excess of such Member's contribution to the capital of the Company over all prior distributions to the Member that have resulted from Capital Events.

(b) Among the Members in the proportion that the Capital Contribution of each Member bears to the total Capital Contributions of all Members.

4.7. In any fiscal year of the Company, Losses in excess of Profits of the Company, resulting from a Capital Event in that fiscal year, shall be allocated to the Members with positive Capital Accounts, in proportion to their positive Capital Account balances, until no Member has a positive Capital Account. For this purpose Capital Accounts shall be reduced by the adjustments set forth in Reg sections 1.704-1(b)(2)(ii)(d)(4), (5), and (6).

4.8. Any unrealized appreciation or unrealized depreciation in the values of Company property distributed in kind to Members shall be deemed to be Profits or Losses realized by the Company immediately prior to the distribution of the property and such Profits or Losses shall be allocated to the Capital Accounts in the same proportions as Profits are allocated under Section 4.1. Any property so distributed shall be treated as a distribution

to the Members to the extent of the Fair Market Value of the property, less the amount of any liability secured by and related to the property. Nothing contained in this Agreement is intended to treat or cause such distributions to be treated as sales for value. For the purposes of this Section 4.8, "unrealized appreciation" or "unrealized depreciation" shall mean the difference between the Fair Market Value of such property and the Company's federal adjusted tax basis for such property.

4.9. Any item of income, gain, loss, or deduction with respect to any property (other than cash) that has been contributed by a Member to the capital of the Company, or that has been revalued pursuant to the provisions of Article III, Section 3. [6](g), and that is required or permitted to be allocated to such Member for income tax purposes under IRC section 704(c) in order to take into account the variation between the tax basis of such property and its Fair Market Value at the time of its contribution, shall be allocated solely for income tax purposes in the manner required or permitted under IRC section 704(c) using the "traditional" method described in Reg section 1.704-3(b), except that any other method allowable under applicable Regulations may be used for any contribution of property with respect to which there is agreement among the contributing Member and the Manager (and, if the Manager and the contributing Member are Affiliates, a Majority of Members who are not Affiliates of the Manager).

4.10. In the case of a Transfer of an Economic Interest during any fiscal year of the Company, the Assigning Member and Assignee shall each be allocated Profits or Losses based on the number of days each held the Economic Interest during that fiscal year. if the Assigning Member and Assignee agree to a different proration and advise the Manager of the agreed proration before the date of the Transfer, Profits or Losses from a Capital Event during that fiscal year shall be allocated to the holder of the Interest on the day such Capital Event occurred. If an Assignee makes a subsequent Assignment, said Assignee shall be considered an "Assigning Member" with respect to the subsequent Assignee for purposes of the aforesaid allocations.

4.11. (a) The Gross Asset Value of all Company property shall be adjusted as of the following times: (l) the acquisition of an interest or additional interest in the Company by any new or existing Member in exchange for more than a de minimis Capital Contribution; (2) the distribution of money or other property (other than a de minimis amount) by the Company to a Member as consideration for Economic Interest in the Company, and (3) the liquidation of the Company within the meaning of Reg section 1.704-l(b)(2)(ii)(g); provided, however, that adjustments under clauses (1) and (2) above shall be made only in the event of a revaluation of Company property under Article III, Section 3. [6](g) in accordance with Reg section 1.704-1(b)(2)(iv)(f);

(b) The Gross Asset Value of Company property shall be increased or decreased to reflect Adjustments to the adjusted tax basis of such property pursuant to IRC section 732, IRC section 733, or IRC section7 43, subject to the limitations imposed by IRC section 755 and Reg section 1.704-l(b)(2)(iv)(m); and

(c) If the Gross Asset Value of an item of property has been determined or adjusted pursuant to Article I, Section 22 or Paragraph (a) or (b) of this Section 4.11, such Gross Asset Value shall be adjusted by the Book Depreciation if, any, taken into account with respect to such property for purposes of computing Profits and Losses.

4.12. It is the intent of the Members that each Member's allocated share of Company Tax Items be determined in accordance with this Agreement to the fullest extent permitted by IRC sections 704 (b) and 704(c). Notwithstanding anything to the contrary contained in this Agreement, if the Company is advised that, as a result of the adoption of new or amended regulations pursuant to IRC sections 704(b) and 704(c), or the issuance of authorized interpretations, the allocations provided in this Agreement are unlikely to be respected for federal income tax purposes, the Manager is hereby granted the power to amend the allocation provisions of this Agreement, on advice of accountants and legal counsel, to the minimum extent necessary to cause such allocation provisions to be respected for federal income tax purposes,



4.13. All Available Cash, other than revenues or proceeds from a Capital Event or the dissolution of the Company, shall be distributed among the Members in the same manner as Profits. The parties intend that Available Cash shall be distributed as soon as practicable following the Manager's determination that such cash is available for distribution. The parties acknowledge that no assurances can be given with respect to when or whether said cash will be available for distributions to the Members.



4.14. All Available Cash resulting from a Capital Event (as distinguished from normal business operations or the dissolution of the Company) shall be distributed to the Members in accordance with their respective Percentage interests at such times as the Members may agree,

4.15. If the proceeds from a sale or other disposition of an item of Company property consistent of property other than cash, the value of that property shall be as determined by the Manager. Such on cash proceed shall then be allocated among all the Members in proportion to their Percentage Interests. If such non-cash proceeds are subsequently reduced to cash, such cash shall be distributed to each Member in accordance with Section 4.14.

4.16. Notwithstanding any other provisions of this Agreement to the contrary, when there is a distribution in liquidation of the Company, or when any Member's interests liquidated, all items of income and loss first shall be allocated to the Members Capital Accounts under this Article IV, and other credits and deductions to the Members Capital Accounts shall be made before the final distribution is made. The final distribution to the Members shall be made as provided in Article IX, Section9 .2(d) of this Agreement. The provisions of this Section 4 .16 and Article IX, Section9 .2(d) shall be construed in accordance with the requirements of Reg section1 .704-1(b)(2)(ii)(b)(2).

## ARTICLE V: MANAGEMENT

5.1. The business of the Company shall be managed by the Person named as a Manager in Article II, Section 2 .9. or any successors, selected as provided in Section 5 .3. Except as otherwise provided in this Agreement, all decisions concerning the management of the Company's business shall be made by the Manager or if there is more than one Manager, then by a Vote of a majority, by member, of the Managers.

5.2. Each Manager shall serve until the earlier of (l) the Manager's resignation, retirement, death, or disability; (2) the Manager's removal by the Members; and (3) the expiration of the Manager's term as Manager, if a term has been designated by a Majority of Members, A new Manager shall be appointed by a majority of Members on the occurrence of any of the foregoing events.

5.3. Each Manager has been appointed by a Majority of Members for (a) a term expiring with the appointment of a successor. A Manager who is not also a Member may be removed with or without cause at any time by action of a Majority of Members. A Manager who is a Member may be removed only on the Vote of all other Members and the execution and filing of a Certificate of Amendment of the Articles of Organization of the Company in conformity with Corporations Code section 17054, if necessary, to provide that the Company is to be managed by Members.

5.4, The Manager shall have the powers and duties described in Section 5.8 hereof and such other powers and duties as may be prescribed in this Agreement or by the Members. Notwithstanding the foregoing, the Manager shall not take any of the following actions on behalf of the Company unless all of the Members consent to the taking of such action.

    (a) Any act that would make it impossible to carry on the ordinary business of the Company;
    (b) Any confession of a judgment against the Company
    (c) The dissolution of the Company;
    (d) The disposition of all or a substantial part of the Company's assets not in the ordinary course of business:
    (e) The incurring of any debt not in the ordinary course of business;
    (f) A change in the nature of the principal business of the Company;
    (g) The incurring of any contractual obligation or the making of any capital expenditure with a total cost of more than ten thousand dollars ($10,000);
    (h) The filing of a petition in bankruptcy or the entering into of an arrangement among creditors; and
    (i) The entering into, on behalf of the Company, of any transaction constituting a "reorganization" within the meaning of Corp C 17600.
    (j) The employing, hiring, or otherwise working in the Company of any spouse, girlfriend, and/or significant other of any of the Members without unanimous vote of all Members.

5.5. If there is more than one Manager, actions of the Managers shall be taken at meetings or as otherwise provided in this Section 5.5 by a majority. No regular meetings of the Managers need be held. The Managers may call a meeting of the Managers by giving Notice of the time and place of the meeting at least 48 hours prior to the time of the holding of the meeting. The Notice need not specify the purpose of the meeting, nor the location if the meeting is to be held at the principal executive office of the Company.



If there is more than one Manager, a majority of Managers shall constitute a quorum for the transaction of business at any meeting of the Managers.

If there is more than one Manager, the transactions of the Managers at any meeting, however called or noticed, or wherever held, shall be as valid as though transacted at a meeting duly held after call and notice if a quorum is present and if either before or after the meeting, each Manager not present signs a written waiver of notice or a consent to the holding of such meeting or an approval of the minutes of such meeting.

If there is more than one Manager any action required or permitted to be taken by the Managers under this Agreement may individually or collectively consent in writing to such action.

Managers may participate in the meeting through the use of a conference telephone or similar communications equipment, provided that all Managers participating in the meeting can hear one another.

The Manager shall keep or cause to be kept with the books and records of the Company full and accurate minutes of all meetings, notices and waivers of notices of meetings, and all written consents of actions of the Managers, if there is more than one Manager.

5.6. It is acknowledged that the Manager has other business interests to which the Manager devotes part of the Manager's time. The Manager shall devote such time to the conduct of the business of the Company as tire Manager, in the Manager's own good faith and discretion, deems necessary.

5.7. The Manager shall be entitled to compensation for the Manager's services and to reimbursement for all expenses reasonably incurred by the Manager in the performance of the Manager's duties.

5.8. The Manager shall be the chief executive officer of the Company and shall have general supervision of the business and affairs of the Company, shall preside at all meetings of Members and of Managers, and shall have such other powers and duties usually vested in a chief executive officer. A Unanimous Vote of the Members is required to assign additional officers of the Company, and to alter the powers and duties of the Manager. The Manager can establish the powers and duties of all other officers and the compensation of all Company officers and amendment the articles of organization of this Agreement as required.

5.9. The Manager shall cause all assets of the Company whether real or personal, to be held in the name of the Company.

5.10. All funds of the Company shall be deposited in one or more accounts with one or more recognized financial institutions in the name of the Company, at such locations as shall be determined by the Manager. Withdrawal from such accounts shall require only the signature of the Manager or such other person or persons as the Manager may designate.

## ARTICLE VI: ACCOUNTS AND ACCOUNTING

6.1. Complete books of account of the Company's business in which each Company transaction shall be fully and accurately entered, shall be kept at the Company's principal executive office and at such other locations as the Manager shall determine from time to time and shall be open to inspection and copying on reasonable Notice by any Member or the Member's authorized representatives during normal business hours. The costs of such inspection and copying shall be borne by the Member.

6.2. Financial books and records of the company shall be kept on the cash method of accounting, which shall be the method of accounting followed by the company for federal income, tax purposes. The financial statements of the Company shall be appropriate and adequate for the company's business and for carrying out the provisions of this Agreement. The fiscal year of the Company shall be January 1 through December 31.

6.3. At all times during the term of existence of the Company, and beyond that term if the Manager deems it necessary; the Manager shall keep or cause to be kept the books of account referred to in Section 6.2, together with:

(a) A current list of the full name and last known business or residence address of each Member, together with the capital contribution and the share in Profits and Losses of each Member;

(b) A current list of the full name and business or residence address of each Manager;

(c) A copy of the Articles of Organization, as amended;

(d) Copies of the Company's federal, state, and local income tax or information returns and reports, if any, for the six most recent taxable years;

(e) An original executed copy or counterparts of this Agreement, as amended;

(f) Any powers of attorney under which the Articles of Organization or any amendments to said articles were executed;

(g) Financial statements of the Company for the six most recent fiscal years, and

(h) The books and Records of the Company as they relate to the Company's internal affairs for the current and past four fiscal years.

If the Manager deems that any of the foregoing items shall be kept beyond the term of existence of the Company, the repository of said items shall be as designated by the Manager.

6.4. Within 75 days after the end of each taxable year of the Company the Manager shall send to each of the Members all information necessary for the Members to complete their federal and state income tax or information returns and a copy of the Company's federal, state, and local income tax or information returns for such year.

## ARTICLE VII: MEMBERSHIP-MEETINGS,

## VOTING, INDEMNITY

7.1. There shall be only one class of membership and no Member shall have any rights or preferences in addition to or different from those possessed by any other Member except as specifically provided for in Article IV. Members shall have the right and power to appoint, remove, and replace Managers and officers of the Company and the right to Vote on all other matters with respect to which this Agreement or the Act requires or permits such Member action. Each Member shall Vote in proportion to the Member's Percentage Interest as of the governing record date, determined in accordance with Section 7 .2, If a Member has assigned all or part of the Member's Economic Interest to a person who has not been admitted as a Member, the Assigning Member shall Vote in proportion to the Percentage Interest that the Assigning Member would have had, if the assignment had not been made.

Without limiting the foregoing, all of the following acts shall require a sixty-six and two-thirds percent (66 2/3%) Vote of the Members:

(a) The Transfer of a Membership Interest and the admission of the Assignee as a Member of the Company;

(b) A compromise of the obligation of a Member to make a Capital Contribution under Article III.

7.2. The record date for determining the Members entitled to receive Notice of any meeting, to Vote, to receive any distribution, or to exercise any right in respect of any other lawful action, shall be the date set by the Manager or by a Majority of Members; provided that such record date shall not be more than 60, or less than ten calendar days prior to the date of the meeting and not more than 60 calendar days prior to any other

action. In the absence of any action setting a record date, the record date shall be determined in accordance with Corp C section 17104(k).

7.3. At all meetings of Members, a Member may Vote in person or by Proxy. Such Proxy shall be filed with the Manager before or at the time of the meeting, and may be filed by facsimile transmission to the Manager at the principal executive office of the Company or such other address as may be given by the Manager to the Members for such purposes.

## ARTICLE VIII: TRANSFERS OF MEMBERSHIP INTERESTS

8.1. A Member may not withdraw from the Company without the written consents of all remaining Members. Withdrawal shall not release a Member from any obligations and liabilities under this Agreement accrued or incurred prior to the effective date of withdrawal. A withdrawing Member shall have only the rights of a holder of an Economic Interest in the Company in respect of the Member's Membership Interest in the Company. Unless all remaining Members consent to such withdrawal, the withdrawing Member shall not be entitled to a distribution of its Economic Interest until the dissolution and liquidation of the Company. For purposes of this Section 8.1, the term "Economic Interest" shall not mean or include any right to share in the income, gains, losses, deductions, credits, or similar items of the Company attributable to any period following withdrawal, or any right to information concerning the business and affairs of the Company, except as provided in Corporations Code section 17106.

8.2. Except as expressly provided in this Agreement, a Member shall not transfer any part of the Member's Membership Interest in the Company, whether now owned or later acquired, unless (a) the other Members unanimously approve the transferee's admission to the Company as a Member upon such Transfer and (b) the Membership Interest to be transferred, when added to the total of all other Membership Interests transferred in the preceding 12 months, will not cause the termination of the Company under the Code. No Member may Encumber or permit or suffer any Encumbrance of all or any part of the Member's Membership Interest in the Company unless such Encumbrance has been approved in writing by the Manager. Such approval may be granted or withheld in the Manager's sole discretion. Any Transfer or Encumbrance of a Membership Interest without such approval shall be void. Notwithstanding any other provision of this Agreement to the contrary, a Member who is a natural person may transfer all or any portion of his or her Membership Interest to any revocable trust created fol the benefit of the Member, or any combination between or among the Member and the Member's issue; provided that the Member retains a beneficial interest in the trust and ail of the Voting Interest included in such Membership Interest. A Transfer of a Member's beneficial interest in such trust, or failure to retain such Voting Interest, shall be deemed a Transfer of a Membership interest.

8.3. If a Member wishes to transfer any or all of the Member's Membership Interest in the Company pursuant to a Bona Fide Offer (as defined below), the Member shall give Notice to the Managers at least 30 days in advance of the proposed sale or Transfer, indicating the terms of the Bona Fide Offer and the identity of the offeror. The Company

and the other Members shall have the option to purchase the Membership Interest proposed to be transferred at the price and on the terms provided in this Agreement. If the price for the Membership Interest is other than cash, the fair value in dollars of the price shall be as established in good faith by the Company. For purposes of this Agreement, "Bona Fide Offer" means an offer in writing setting forth all relevant terms and conditions of purchase from an offeror who is ready, willing, and able to consummate the purchase and who is not an Affiliate of the selling Member. For 30 days after the Notice is given, the Company shall have the right to purchase the Membership Interest offered, on the terms stated in the Notice, for the lesser of (a) the price stated in the Notice (or the price plus the dollar value of noncash consideration, as the case may be) and (b) the price determined under the appraisal procedures set forth in Section 8.8.

If the Company does not exercise the right to purchase all of the Membership Interest, then, with respect to the portion of the Membership Interest that the Company does not elect to purchase, that right shall be given to the other Members for an additional 30-dayperiod, beginning on the day that the Company's right to purchase expires. Each of the other Members shall have the right to purchase, on the same terms, a part of the interest of the offering Member in the proportion that the Member's Percentage Interest bears to the total Percentage Interests of all of the Members who choose to participate in the purchase; provided, however, that the Company and the participating Members may not, in the aggregate, purchase less than the entire interest to be sold by the offering Member.

If the Company and the other Members do not exercise their rights to purchase all of the Membership Interest, the offering Member may, within 90 days from the date the Notice is given and on the terms and conditions stated in the Notice, sell or exchange that Membership Interest to the offeror named in the Notice. Unless the requirements of Section 8.2 are met, the offeror under this section shall become an Assignee, and shall be entitled to receive only the share of Profits or other compensation by way of income and the return of Capital Contribution to which the assigning Member would have been entitled.

8.4. On the happening of any of the following events (Triggering Events) with respect to a Member or an Assignee of an economic interest, the Company and the other Members shall have the option to purchase the economic interest or Membership Interest in the Company of such Assignee of an economic interest or Member (Selling Member) at the price and on the terms provided in Section 8.8 of this Agreement:

(a) The death, bankruptcy, or withdrawal of a Member or an Assignee of an economic interest, or the winding up and dissolution of a corporate Member, or merger or other corporate reorganization of a corporate Member as a result of which the corporate Member does not survive as an entity; provided that the remaining Members have elected to continue the business of the Company as provided in Article IX, Section 9.l(a)

(b) The failure of a Member or an Assignee of an economic interest to make the Member's Capital Contribution pursuant to the provisions of Article III of this Agreement.

(c) The occurrence of any other event that is, or that would cause, a Transfer in contravention of this Agreement.

Each Member or Assignee of an economic interest agrees to promptly give Notice of a Triggering Event to the Managers.

8.5. Notwithstanding any other provisions of this Agreement:

(a) If, in connection with the divorce or dissolution of the marriage of a Member, any court issues a decree or order that transfers, confirms, or awards a Membership Interest, or any portion thereof to that Member's spouse (an "Award"), then, notwithstanding that such transfer would constitute an unpermitted Transfer under this Agreement, that Member shall have the right to purchase from his or her former spouse the Membership Interest, or portion thereof that was so transferred, and such former spouse shall sell the Membership Interest or portion thereof to that Member at the price set forth below in Section 8.8 of this Agreement. If the Member has failed to consummate the purchase within 180 days after the court award (the Expiration Date), the Company and the other Members shall have the option to purchase from the former spouse the Membership Interest or portion thereof pursuant to Section 8.6 of this Agreement; provided that the option period shall commence on the later of (1) the day following the Expiration Date, or (2) the date of actual notice of the Award.

(b) Upon the death of a Member or an Assignee of an economic interest, the interest of such deceased person may only be left to another Member, the issue of another Member or the issue of such deceased person. If, by reason of the death of a spouse of a Member, any portion of a Membership Interest is transferred to a Transferee other than (1) that Member or (2) a trust created for the benefit of that Member (3) or for the benefit of that Member and any combination between or among the Member and the Member's issue, in which the Member is the sole Trustee and the Member, as Trustee or individually possesses all of the Voting Interest included in that Membership Interest, then the Member shall have the right to purchase the Membership Interest or portion thereof from the estate or other successor of his or her deceased spouse or Transferee of such deceased spouse, and the estate, successor, or Transferee shall set the Membership Interest or portion thereof at the price set forth in Section 8.8 of this Agreement. If the Member has failed to consummate the purchase within 180 days after the date of death (the Expiration Date), the Company and the other Members shall have the first right to purchase from the estate or other successor of the deceased spouse the Membership Interest shall or portion thereof pursuant to Section 8.6 of this Agreement; provided that the option period shall commence on the later of (1) the day following the Expiration Date, or (2) the date of actual notice of the death.

8.6. On the receipt of Notice by the Manager and the other Members as contemplated by Sections 8.1, 8.3, and 8.5, and on receipt of actual notice of any Triggering Events as determined in good faith by the Manager (the date of such receipt is hereinafter referred to as the "Option Date") the Manager shall promptly cause a Notice of the occurrence of such a Triggering Event to be sent to all Members, and the Company shall have the option, for a period ending 30 calendar days following the determination of the purchase price as provided in Section 8.8, to purchase the Membership Interest in the Company to which the option relates, at the price and on the terms set forth in Section 8.8 of this Agreement, and the other Members, pro rata in accordance with their prior Membership Interests in the Company, shall then have the option, for a period of 30 days thereafter, to purchase the Membership Interest in the Company not purchased by the Company, on the same terms and conditions as apply to the Company. If all other Members do not elect to purchase the entire remaining Membership Interest in the Company, then the Members electing to purchase shall have the right, pro rata in accordance with their prior Membership Interest in the Company, to purchase the additional Membership Interest in the Company available for purchase The transferee of the Membership Interest in the Company that is not purchased shall hold such Membership Interest in the Company subject to all of the provisions of this Agreement.

8.7. Neither the Member whose interest is subject to purchase under this Article, nor such Member's Affiliate, shall participate in any Vote or discussion of any matter pertaining to the disposition of the Member's Membership Interest in the Company under this Agreement.

8.8. The purchase price of the Membership Interest that is the subject of an option under Section 8.6 shall be the, "Fair Option Price" of the interest and determined under this Section 8.8. "Fair Option Price", means f lie cash price that a willing buyer would pay to a willing seller when neither is acting under compulsion and when both have reasonable knowledge of the relevant facts on the Option bate. Each of the selling and purchasing parties shall use his, her, or its best efforts to mutually agree upon the Fair Option Price. If the parties are unable to so agree within 30 days of the Option Date, the selling party shall appoint, within 40 days of the Option Date, one appraiser, and the purchasing party shall appoint within 40 days of the Option Date, one appraiser. The two appraisers shall within a period of five additional days, agree upon and appoint an additional appraiser. The three appraisers shall, within 60 days after the appointment of the third appraiser, determine the Fair Option Price of the Membership Interest in writing and submit their report to all the parties.

The Fair Option Price shall be determined by disregarding the appraiser's valuation that diverges the greatest from each of the of the two appraisers' valuations, and the arithmetic mean of the remaining two appraisers' valuations shall be the Fair Option

Price, Each purchasing party shall pay for the services of the appraiser selected by it, plus one half of the fee charged by the third appraiser, and one half of all other costs relating to the determination of Fair Option Price. The Fair Option Price as so determined shall be payable in cash.

8.9. Except as expressly permitted under Section 8.2, a prospective transferee (other than an existing Member) of a Membership Interest may be admitted as a Member with respect to such Membership Interest (Substituted Member) only (a) on the unanimous Vote of the other Members in favor of the prospective transferee's admission as a Member, and (b) on such prospective transferee executing a counterpart of this Agreement as a party hereto. Any prospective transferee of a Membership Interest shall be deemed an Assignee's, and, therefore, the owner of only an Economic Interest until such prospective transferee has been admitted as a Substituted Member. Except as otherwise permitted in the Act, any such Assignee shall be entitled only to receive allocations and distributions under this Agreement with respect to such Membership Interest and shall have no right to Vote to exercise any rights of a Member until such Assignee has been admitted as a Substituted Member. Until the Assignee becomes a Substituted Member, the Assigning Member will continue to be a Member and to have the power to exercise any rights and powers of a Member under this Agreement, including the right to Vote in proportion to the Percentage Interest that the Assigning Member would have had in the event that the assignment had not been made.

8.10. Any person admitted to the Company as a Substituted Member shall be subject to all the provisions of this Agreement that apply to the Member from whom the Membership Interest was assigned, provided, however, that the assigning Member shall not be released from liabilities as a Member solely as a result of the assignment, both with respect to obligations to the Company and to third parties, incurred prior to the assignment.

8.11. The initial sale of Membership Interests in the Company to the Initial Members has not been qualified or registered under the securities laws of any state, including California, or registered under the Securities Act of 1933, in reliance upon exemptions from the registration provisions of those laws. Notwithstanding any other provision of this Agreement, Membership Interest may not be transferred unless registered or qualified under applicable state and federal securities law unless, in the opinion of legal counsel satisfactory to the Company, such qualification or registration is not required. The Member who desires to transfer a Membership Interest shall be responsible for all legal fees incurred in connection with said opinion.

## ARTICLE IX: DISSOLUTION AND WINDING UP

9.1. The Company shall be dissolved upon the first to occur of the following events:

(a) The death, bankruptcy, retirement, resignation, expulsion, or dissolution of a Member, if the remaining Members, by the Vote of a Majority of Members within 180 days of the happening of that event Vote to dissolve the business of the

Company, in which case, the Company shall dissolve. For purposes of this Paragraph (a), in determining a Majority of Members, the Percentage Interest of the Member who has died, become bankrupt, retired, resigned, been expelled or dissolved shall not be taken into account.

(b) The expiration of the term of existence of the Company.

(c) The written agreement of all Members to dissolve the Company.

(d) The sale or other disposition of substantially all of the Company's assets.

(e) Entry of a decree of judicial dissolution under Corporations Code section 17351.

9.7. On the dissolution of the Company, the Company shall engage in no further business other than that necessary to wind up the business and affairs of the Company. The Managers who have not wrongfully dissolved the Company or', if there is no such Manager, the Members, shall wind up the affairs of the Company. The Delegates winding up the affairs of the Company shall give Notice of the commencement of winding up by mail to all known creditors and claimants against the Company whose addresses appear in the records of the Company. After paying or adequately providing for the payment of all known debts of the Company (except debts owing to Members), the remaining assets of the Company shall be distributed or applied in the following order:

(a) To pay the expenses of liquidation.

(b) To the establishment of reasonable reserves by the Delegate for contingent liabilities or obligations of the Company. Upon the Delegate's determination that such reserves are no longer necessary, said reserves shall be distributed as p provided in this Section 9.2.

(c) To repay outstanding loans to Members. If there are insufficient funds to pay such Loans in full, each Member shall be repaid in the ratio that the Member's loan, together with interest accrued and unpaid there on, bears to the total of all such loans from Members, including all interest accrued and unpaid thereon. Such repayment shall first be credited to unpaid principal and the remainder shall be credited to accrued and unpaid interest.

(d) Among the Members with Positive Capital Account Balances as provided in Article IV, Section. 4.16.

9.3. Each Member shall look solely to the assets of the Company for the return of the Member's investment, and if the Company property remaining after the payment or discharge of the debts and liabilities of the Company is insufficient to return the investment of each Member, such Member shall have no recourse against any other

Members for indemnification, contribution, or reimbursement, except as specifically provided in this Agreement.

## ARTICLE X: ARBITRATION

10.1. Any action to enforce or interpret this Agreement, or to resolve disputes with respect to this Agreement as between the Company and a Member, or between or among the Members, shall be settled by arbitration in accordance with the rules of the American Arbitration Association. Arbitration shall be the exclusive dispute resolution process in the State of California, but arbitration shall be a nonexclusive process elsewhere. Any party may commence arbitration by sending a written demand for arbitration to the other parties. Such demand shall set forth the nature of the matter to be resolved by arbitration. The Manager shall select the place of arbitration. The substantive law of the State of California shall be applied by the arbitrator to the resolution of the dispute. The parties shall share equally all initial costs of arbitration. The prevailing party shall be entitled to reimbursement of attorney fees, costs, and expenses incurred in connection with the arbitration. All decisions of the arbitrator shall be final, binding, and conclusive on all parties. Judgment may be entered upon any such decision in accordance with applicable law in any court having jurisdiction thereof. The arbitrator (if permitted under applicable law) or such court may issue a writ of execution to enforce the arbitrator's decision.

## ARTICLE XI: GENERAL PROVISIONS

11.1. This Agreement constitutes the whole and entire agreement of the parties with respect to the subject matter of this Agreement, and it shall not be modified or amended in any respect except by a written instrument executed by all the parties. This Agreement replaces and supersedes all prior written and oral agreements by and among the Members and Managers or any of them.

11.2. This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

11.3. This Agreement shall be construed and enforced in accordance with the internal laws of the State of California. If any provision of this Agreement is determined by any court of competent jurisdiction or arbitrator to be invalid, illegal, or unenforceable to any extent, that provision shall, if possible, be construed as though more narrowly drawn, if a narrower construction would avoid such invalidity, illegality, or unenforceability or, if that is not possible, such provision shall, to the extent of such invalidity, illegality, or unenforceability, be severed, and the remaining provisions of this Agreement shall remain in effect.

11.4. This Agreement shall be binding on and inure to the benefit of the parties and their heirs, personal representatives, and permitted successors and assigns.

11.5. Whenever used in this Agreement, the singular shall include the plural and the plural shall include the singular, and the neuter gender shall include the male and female as well as a trust, firm, company, or corporation, all as the context and meaning of this Agreement may require.

11.6. The parties to this Agreement shall promptly execute and deliver any and all additional documents, instruments, notices, and other assurances, and shall do any and all other acts and things, reasonably necessary in connection with the performance of their respective obligations under this Agreement and to carry out the intent of the parties.

11.7. Except as provided in this Agreement, no provision of this Agreement shall be construed to limit in any manner the Members in the carrying on of their own respective businesses or activities.

11.8. Except as provided in this Agreement, no provision of this Agreements shall be construed to constitute a Member, in the Member's capacity as such, the agent of any other Member.

11.9. Each Member represents and warrants to the other Members that the Member has the capacity and authority to enter into this Agreement.

11.10. The article, section, and paragraph titles and headings contained in this Agreement are inserted as a matter of convenience and for ease of reference only and shall be disregarded for all other purposes, including the construction or enforcement of this Agreement or any of its provisions.

11.11. This Agreement may be altered, amended, or repealed only by a writing signed by all of the Members. .

11.12. Time is of the essence of every provision of this Agreement that specifies a time for performance.

11.13. This Agreement is made solely for the benefit of the parties to this Agreement and their respective permitted successors and assigns, and no other person or entity shall have or acquire any right by virtue of this Agreement.

IN WITNESS WHEREOF, the parties have executed or caused to be executed this Agreement on the day and year first above written.

RONALD C. NICHOLSEN
Manager and Member

HAMILTON NICHOLSEN
Manager and Member

SUSANNA R. KELHAM
Manager and Member

KELHAM VINEYARDS & WINERY, LLC

## EXHIBIT 2

### MEMBERS

| NAME: | ADDRESS: |
|---|---|
| SUSANNA R. KELHAM | P.O. Box 2707, Yountville, California 94599 |
| RONALD C. NICHOLSEN | P.O, Box 2707, Yountville, California 94599 |
| HAMILTON R. NICHOLSEN | P.O. Box 2707, Yountville, California 94599 |

KELHAM VINEYARDS & WINERY, LLC

EXHIBIT 3

MANAGER

Name:                                    Address:

Susanna R. Kelham                        360 Zinfandel Lane, St. Helena, CA 94574

Successors:

Hamilton Nicholsen, Member               360 Zinfandel Lane, St. Helena, CA 94574

Ronald Nicholsen, Member                 360 Zinfandel Lane, St. Helena, CA 94574

As Equal Managing Members





# State of California
## Secretary of State

## LIMITED LIABILITY COMPANY
## CERTIFICATE OF AMENDMENT

**A $30.00 filing fee must accompany this form.**

**IMPORTANT – Read instructions before completing this form.**

This Space For Filing Use Only

| 1. SECRETARY OF STATE FILE NUMBER | 2. NAME OF LIMITED LIABILITY COMPANY |
|---|---|
| **200035310017** | Kelham Vineyards & Winery LLC |

3. COMPLETE ONLY THE SECTIONS WHERE INFORMATION IS BEING CHANGED. ADDITIONAL PAGES MAY BE ATTACHED IF NECESSARY.

**A.** LIMITED LIABILITY COMPANY NAME (END THE NAME WITH THE WORDS "LIMITED LIABILITY COMPANY," "LTD. LIABILITY CO." OR THE ABBREVIATIONS "LLC" OR "L.L.C.")

**B.** THE LIMITED LIABILITY COMPANY WILL BE MANAGED BY (CHECK ONE):

[✓] ONE MANAGER
[ ] MORE THAN ONE MANAGER
[ ] ALL LIMITED LIABILITY COMPANY MEMBER(S)

**C.** AMENDMENT TO TEXT OF THE ARTICLES OF ORGANIZATION:

As attached

**D.** OTHER MATTERS TO BE INCLUDED IN THIS CERTIFICATE MAY BE SET FORTH ON SEPARATE ATTACHED PAGES AND ARE MADE A PART OF THIS CERTIFICATE. OTHER MATTERS MAY INCLUDE A CHANGE IN THE LATEST DATE ON WHICH THE LIMITED LIABILITY COMPANY IS TO DISSOLVE OR ANY CHANGE IN THE EVENTS THAT WILL CAUSE THE DISSOLUTION.

4. FUTURE EFFECTIVE DATE, IF ANY:

| **MONTH** | November | **DAY** | 1 | **YEAR** | 2010 |
|---|---|---|---|---|---|

5. NUMBER OF PAGES ATTACHED, IF ANY:

6. IT IS HEREBY DECLARED THAT I AM THE PERSON WHO EXECUTED THIS INSTRUMENT, WHICH EXECUTION IS MY ACT AND DEED.

November 1, 2010
DATE

SIGNATURE OF AUTHORIZED PERSON

Susanna Kelham
TYPE OR PRINT NAME AND TITLE OF AUTHORIZED PERSON

7. **RETURN TO:**

NAME — Susanna Kelham
FIRM — Kelham Vineyards & Winery LLC
ADDRESS — 360 Zinfandel Lane
CITY/STATE — St. Helena, CA 94574
ZIP CODE

SEC/STATE FORM LLC-2 (Rev. 03/2006) – FILING FEE $30.00

APPROVED BY SECRETARY OF STATE



# State of California
## Secretary of State

I, DEBRA BOWEN, Secretary of State of the State of California, hereby certify:

That the attached transcript of ___|___ page(s) is a full, true and correct copy of the original record in the custody of this office.



**IN WITNESS WHEREOF**, I execute this certificate and affix the Great Seal of the State of California this day of

FEB 2 2 2010

*Jebra Bowen*

**DEBRA BOWEN**
**Secretary of State**

*Sec/State Form CE-109 (REV 01/2009)*

 OSP 09 118843



# State of California
## Secretary of State

**STATEMENT OF INFORMATION**
(Limited Liability Company)

L

Filing Fee $20.00. If amendment, see instructions.

**IMPORTANT — READ INSTRUCTIONS BEFORE COMPLETING THIS FORM**

**ENDORSED - FILED**
in the office of the Secretary of State
of the State of California

JAN 0 8 2010

This Space For Filing Use Only

1. LIMITED LIABILITY COMPANY NAME (Please do not alter if name is preprinted.)

KELHAM VINEYARDS & WINERY, LLC
200035310017

**DUE DATE:**

**FILE NUMBER AND STATE OR PLACE OF ORGANIZATION**

| 2. SECRETARY OF STATE FILE NUMBER | 3. STATE OR PLACE OF ORGANIZATION |
|---|---|
| 200035310017 | CALIFORNIA |

**COMPLETE ADDRESSES FOR THE FOLLOWING** (Do not abbreviate the name of the city. Items 4 and 5 cannot be P.O. Boxes.)

| 4. STREET ADDRESS OF PRINCIPAL EXECUTIVE OFFICE | CITY AND STATE | | ZIP CODE |
|---|---|---|---|
| 360 ZINFANDEL LN | SAINT HELENA, CA | | 94574 |

| 5. CALIFORNIA OFFICE WHERE RECORDS ARE MAINTAINED (DOMESTIC ONLY) | CITY | STATE | ZIP CODE |
|---|---|---|---|
| 360 ZINFANDEL LN | SAINT HELENA | CA | 94574 |

**NAME AND COMPLETE ADDRESS OF THE CHIEF EXECUTIVE OFFICER, IF ANY**

| 6. NAME | ADDRESS | CITY AND STATE | ZIP CODE |
|---|---|---|---|
| | | | |

**NAME AND COMPLETE ADDRESS OF ANY MANAGER OR MANAGERS, OR IF NONE HAVE BEEN APPOINTED OR ELECTED, PROVIDE THE NAME AND ADDRESS OF EACH MEMBER** (Attach additional pages, if necessary.)

| 7. NAME | ADDRESS | CITY AND STATE | ZIP CODE |
|---|---|---|---|
| SUSANNA KELHAM | 1469 DWYERD RD/ PO BOX 2707 | YOUNTVILLE, CA | 94571 |
| 8. NAME | ADDRESS | CITY AND STATE | ZIP CODE |
| RON NICHOLSEN | 360 ZINFANDEL LN | SAINT HELENA, CA | 94574 |
| 9. NAME | ADDRESS | CITY AND STATE | ZIP CODE |
| HAMILTON NICHOLSEN | 360 ZINFANDEL LN | SAINT HELENA, CA | 94574 |

**AGENT FOR SERVICE OF PROCESS** (If the agent is an individual, the agent must reside in California and Item 11 must be completed with a California address. If the agent is a corporation, the agent must have on file with the California Secretary of State a certificate pursuant to Corporations Code section 1505 and Item 11 must be left blank.)

| 10. NAME OF AGENT FOR SERVICE OF PROCESS |
|---|
| SUSANNA KELHAM |

| 11. ADDRESS OF AGENT FOR SERVICE OF PROCESS IN CALIFORNIA, IF AN INDIVIDUAL | CITY | | ZIP CODE |
|---|---|---|---|
| 360 ZINFANDEL LN | ST HELENA | CA | 94574 |

**TYPE OF BUSINESS**

12. DESCRIBE THE TYPE OF BUSINESS OF THE LIMITED LIABILITY COMPANY

WINERY

13. THE INFORMATION CONTAINED HEREIN IS TRUE AND CORRECT.

| ALAN MILLER | *Alan Smith* | AGENT | 1/7/2010 |
|---|---|---|---|
| TYPE OR PRINT NAME OF PERSON COMPLETING THE FORM | SIGNATURE | TITLE | DATE |

LLC-12 (REV 03/2007)

APPROVED BY SECRETARY OF STATE